BIRDWELL, RESPONDENT, *v.* THREE FORKS PORTLAND CEMENT CO., APPELLANT.

(No. 7,294.)

(Submitted December 5, 1934. Decided January 4, 1935.)

[40 Pac. (2d) 43.]

Mr. D. G. Stivers, Mr. John V. Dwyer and Mr. J. T. Finlen, Jr., for Appellant, submitted an original and a reply brief; Mr. Dwyer and Mr. Finlen argued the cause orally.

486

*Mr. Oscar O. Mueller,* for Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

This is an appeal in a compensation case arising under the Montana Workmen's Compensation Act.

Claim was filed with the Industrial Accident Board by Ethel Davis Birdwell, wife of Claude E. Birdwell, a workman who died on July 15, 1932, while on duty in the course of his employment as a cement burner at the plant of the Three Forks Portland Cement Company, at Trident, Montana. The employer was enrolled under plan No. 1 of the above Act. The claim was resisted, and the matter came to hearing before

the board on November 18, 1932. At that time the testimony of all the witnesses, except that of two doctors, was taken at the plant of the employer. By agreement of counsel the testimony of Dr. Fred F. Attix and Dr. J. L. Soltero was taken at a later date by deposition at Lewistown, Montana. The doctors testified as medical experts, and based their testimony and conclusions very largely, but not entirely, upon a hypothetical question, framed so as to tender for their information and consideration the essential facts of the case already in the record. However, both doctors knew the deceased in his lifetime, and had treated him at times previous to his employment at Three Forks. They were interrogated as to their personal knowledge of him and his physical condition at such previous times. The facts as contained in the hypothetical question submitted to the doctors were evidently deemed by both parties to constitute the facts of the occurrence under investigation. After a careful reading of the testimony of the other witnesses as it appears in the record, we are convinced that the assumption was correct. We therefore quote the hypothetical question as and for a statement of facts of this case:

"Claude E. Birdwell, the deceased, was employed at Three Forks Portland Cement Company's plant at Trident, Montana, as a cement burner. A burner's duties are the supervision of the fire in the kilns which are used in burning the lime rock. The kilns are in a large inclosed building containing three doors, one of which was about thirty feet from the front of the first kiln where the burners were in the habit of sitting when temporarily off duty. The testimony of the witness, Ray Craven, is as follows, to-wit: 'The chute where the clinkers come from the kiln into the conveyor down in the pit became plugged, and Mr. Birdwell and I proceeded to open up the chute as best we could. We tried punching the clinkers, trying to break through from up above without success, and then went down in the pit and tried to hook under and break them, still without success. Then back up on the kiln room floor, and Mr. Birdwell had the bar in his hands and was

punching the chunks as long as he could make headway that way. Then he would hold the iron and I used the sledge-hammer on the end of the bar while in this manner we opened up the chute. This process may have taken five, ten or fifteen minutes. It was a hot job on account of the heat from the kiln itself and the hot material clogged in the bottom of the kiln. We had to get probably four or five feet for a short time from the kiln. The closer you got the hotter it is. It is red-hot material that we were punching. It was considerably warmer where we were punching the material and down in the pit than it was outdoors. Mr. Birdwell's condition soon after, from what he told me, rather than anything I could see from looking at him, was that he had a severe headache and a pain in his chest, and felt rotten, and also was sweating. I was quite warm, sweating profusely, and felt weak and temporarily exhausted. My physical condition was fine that day. I suggested baking soda as a relief. We were sitting on a bench in the doorway in the northwest side of the kiln room. There was a draft coming in the kiln room through this door. We were there some several minutes, at least, Mr. Birdwell looking after the kilns from time to time and coming over and sitting down beside me and leaning his head on the trough which takes water from the kiln room sump. He seemed to be in distress. We were there about twenty minutes probably, more or less. The time of day, as near as I can recall it from my schedule of oiling the conveyors, was about 7 o'clock when the chute first burned off. After that time it is indefinite. I understood it was 8 o'clock when he collapsed or was pronounced dead. I went over to the office to get soda, and was gone for some five minutes, and on my way back was told that he was dead. We went to work about ten minutes before 3 o'clock in the afternoon. The deceased said he had a headache and was constipated. He mentioned to me that he had taken some sal hepatica and that he had been taking some aspirin tablets. I saw him take one dose of Bayer aspirin tablets. How many I do not know.' The witness J. W. Johns testified: 'When I had gone back to the front of the kiln to

get a drink Mr. Birdwell was back there after he had been punching out clinkers and was kind of hot. I asked him how he felt. He said he felt that the heat had gotten him. I got a drink and walked to the feed end of the kiln and climbed the stairs, and looking back saw Mr. Birdwell trying to rise from a bench. He slipped and looked as if he was trying to sit down again, and fell over the side. I went there, and he was laying down in some water. I tried to talk to him and he seemed to be trying to speak to me, but he could not. The blood vessels and everything was standing out on his head. Large chunks of red-hot clinkers sometimes clog the feed, and it is necessary to break these up. They use iron bars about twenty-five feet long and an inch thick and weighing about twenty-five or thirty pounds. It is considerably warmer right in front of the kiln than outside. Where the burners sit in the doorway of the building there is a considerable draft. Mr. Birdwell spoke to me about a headache that afternoon. The doorway where he collapsed was about thirty feet from the kiln.' The witness John T. Murray testified: 'That at about 7:30 I was asked to go to the kiln room and help the boys out, as they were in trouble over there. When I arrived Mr. Birdwell was kind of on his hands and knees at the north door, and I said, "How do you feel?" He was sweating, and he said, "Not very good." I saw that they had trouble with the clinkers. It is considerably warmer around the kilns than outdoors, and in the doorway it is considerably cooler. I was down in the pit fifteen or twenty minutes shoveling clinkers.' Now, assuming these facts to be true, what in your opinion, was the cause of death, Doctor?"

To this question Dr. Attix answered as follows: "Well, from what I know previously of Mr. Birdwell's general health, and one thing and another, and things connected with his life over a period of ten or twelve years, I would say that it was probably due to heat stroke or heat exhaustion—exposure to excessive heat. I base that on the part of this testimony of Ray Craven, in which he states himself, 'I was quite warm, sweating profusely, and felt weak and temporarily exhausted.

My physical condition was fine that day.' In other words, here was a man who admittedly was in an exceptionally fine state of health, and everything connected with it, and on that particular day, and yet he felt the heat connected with that special work that they were doing there to the extent that he was weak and temporarily exhausted. Knowing Mr. Birdwell as I do, he is a nervous, apprehensive individual, and that type of men usually has a vasomotor apparatus that is not too stable. He would probably feel the effects of unusual heat more than the average individual, probably, and the fact that he had these symptoms, toxic symptoms, probably from diseased teeth, and one thing and another, a year or two previously, which left him in probably not a first-class shape physically, as far as being able to·resist the effects of heat and cold. I would say that he was suffering from undue exposure to the avocation or the work he was doing while he was knocking those clinkers out there for some five to fifteen minutes. As I understand it, the man had left Lewistown less than a month previously, and had only been employed partially, or part time. He went right down there and went into a class of work probably in which he was skilled and prepared, yet probably he was not as physically fit as he would have been if he had been there and had had an opportunity to have become used to conditions in which he was working at that time. The heat stroke comes from vasomotor centers that are in the base of the brain, and when you are feeling good and functioning well you are able to stand a certain amount of strain and stress and regulate your system so that you don't feel those things unduly; just the same as in the case of Mr. Craven here, who had only a temporary spell of exhaustion as a result of this exposure. But if you happen to be a little weak or soft from not having been at work for some time, probably being thrown into that sort of exposure would unduly affect him more than it would the average individual. And the symptoms that come about from that come rather hurriedly. They get extreme exhaustion and weakness, and if the thing goes on and there is sufficient exposure, you get a

weakness of the heart, and you may go on even to uncon-
sciousness and delirium, and pass out from the effects of con-
tinued action unless prompt remedial measures are taken in
the way of trying to overcorrect that excessive internal heat.
Sometimes the temperature runs very high in those individuals,
and yet they may, on the surface, be sweating profusely, and
cold and pallid, and all the circulation of the surface of the
body is practically held in abeyance and unstable, and all the
heat that is in them is not regulated and radiated so that they
can throw it off, and they just die from too much internal heat.
There are cases recorded in India where men have even died
in bed from exposure to heat, while there are quoted innumer-
able experiences in tropical countries. It acts very much the
same as a sunstroke does, except, of course, there you have
a direct solar ray on the head, and this is just simply a ques-
tion of exhaustion coming from undue exposure of another
type of heat.''

To the same question Dr. Soltero answered as follows: ''As-
suming that the facts are true, that he was working at that
time under the conditions this witness gives there, I presume
he was overcome by heat, for the reason that the symptoms in
there, all of them, that headache, that sweating and sticking
out of the blood vessels, those are all symptoms of being over-
come by heat.''

Both doctors gave the details of their previous treatment
of Birdwell, but each asserted that there was nothing in the
clinical history of the man to alter his belief that he died from
overexposure to heat.

There was also some testimony in the record as to ventila-
tion, air, and working conditions in the burner room, and to
the effect that no other workman had ever been overcome by
heat in the same circumstances at that plant.

Dr. L. H. Koehler was called as a witness for the defend-
ant. He was evidently in charge of the medical work at the
plant at the time of the accident. He did not reach the scene
until after Birdwell was dead. Upon his arrival he examined
the body and later gave it as his opinion that the man had

died of chronic myocarditis. He had never seen Birdwell in his lifetime. He said that in order to determine positively the cause of the death, it would have been necessary to have a *post-mortem* or autopsy. He said that he asked the widow if she wanted an autopsy and that she said she did not think it necessary. This witness said that he called the coroner at Bozeman and told him of the death, and that upon being informed that there was no question of foul play, the coroner said he would not investigate the case further.

Dr. Soltero also testified that an autopsy would have demonstrated the trouble. He said: "But myocarditis could be proved. For instance, if that same man that died there died of myocarditis, you could make a *post-mortem* and get a piece of the heart, and find out if he died of that. That is a thing that could be done by an autopsy, find out whether he had myocarditis or not. In fact, that way easier than any other way. If he had myocarditis you could find out right there. But heat would be the worst thing that could happen in a case of myocarditis."

After all testimony was in, the board took the matter under advisement and later made findings of fact and conclusions. The findings of fact detailed the testimony and stated that there was no evidence of an accidental injury to deceased. As a conclusion, the board declared that "Birdwell did not suffer an accidental injury or any injury of any kind"; that he was doing his usual work in the regular way, but was not well and was probably ill when he went to work. The board then proceeded to distinguish the case from the *Nicholson Case,* 79 Mont. 358, 257 Pac. 270, and finally declared that the heat from the kilns was not extraordinary on that day, that the physical arrangements and the ventilation of the plant were modern and sufficient to keep the temperature at a degree under which men could work without any difficulty, and in view of the recited finding denied the claim for compensation. Motion for rehearing was made and denied, and an appeal was taken to the district court, where the matter was tried

and decided upon the record of the board without other testimony.

The district judge made independent findings of fact. He recited the facts as he deduced them from the record. His detail of the evidence agreed with that of the board in most particulars. However, in addition to the finding of the board as to the condition of the burner room on the day of the accident, he stressed the fact that Birdwell and his associate were required to remove or break up clinkers in the "chute," and that the chute leads into a pit below the level of the floor or regular working place, and that the process of breaking the clinkers or punching them out required the men to work near the chute, where the temperature was of a much higher degree than normal; that the atmosphere immediately surrounding the chute, and for a short distance therefrom, was hotter than the normal temperature of the general atmosphere in the room. The court then found that the immediate cause of the death of Birdwell was heat exhaustion caused by his exposure to extraordinary heat emitted from the clinker chute while cleaning it out just previous to his death.

In order for the plaintiff to prevail it was necessary for her ▮▮▮▮ to prove by a preponderance of the evidence that Birdwell suffered an industrial accident, and that the injury was the proximate cause of his death. The cause went to the district court with the presumption that the board had decided correctly. (*Moffett* v. *Bozeman Canning Co.*, 95 Mont. 347, 26 Pac. (2d) 973, and cases cited.) When there is conflict in the evidence, if it does not appear that the evidence clearly preponderates against the findings of the board, the judgment of the court reversing the order of the board must be reversed, and the decision of the board dismissing the application must stand.

It seems to us that in this case the question to be decided is not alone one of a preponderance of the evidence because the admitted and uncontradicted facts practically constitute an agreed statement of facts, and therefore leave nothing to be decided but the ultimate question of law. This court has

adopted the rule that: "Where, in a civil action, the facts are admitted or undisputed, or where the evidence is 'all in one direction,' the only questions for decision are those of law. There being no conflict in the evidence, and the proofs being such that reasonable men could come to but one conclusion upon them, the case presents, in effect, an agreed statement of facts." (*Davidson* v. *Stagg*, 94 Mont. 272, 22 Pac. (2d) 152, 153, and cases cited.)

*In re Wadsworth's Estate*, 92 Mont. 135, 11 Pac. (2d) 788, 792, this court said: "But where, as here, there is no dispute as to the facts, this court is in as favorable a position in applying the law as the district court, and in such instances, will not hesitate to do so."

The supreme court of Tennessee, in speaking on the same subject in connection with a compensation case involving the death of a fireman who was overcome by heat in a boiler room, said: "While this court is bound by the findings of the trial judge on questions of fact whenever there is any evidence to sustain the findings, it is not bound by the conclusions drawn by the trial judge from undisputed facts, and may reach a different conclusion from that of the trial court on the same findings of fact." (*King* v. *Buckeye Cotton Oil Co.*, 155 Tenn. 491, 296 S. W. 3, 4, 53 A. L. R. 1086. See, also, *Nicholson* v. *Roundup Coal Co.*, supra.)

Honnold on Workmen's Compensation, section 91, page 288, says: "Whether an injury is an accident is a mixed question of law and fact. When applied to ascertained facts, it is a question of law."

We think the foregoing principles of law are sound and, when applied in this case, they left the district court free to adopt a different conclusion from that announced by the board. By the same token, also, this court is left free to follow that precedent, and, if it so desires, to make its own findings on such undisputed facts.

The only evidence introduced in this case in an attempt to vary the facts of the occurrence—the death of the workman—was that having relation to the physical condition of

deceased previous to and on the day of his death. The most that this evidence accomplished was to show that heart disease may have been one of the contributing causes without which the accident, which actually happened, would not have happened. But this court has said: "If the accident is one of the contributing causes, without which the injury which actually followed would not have followed, an employee is entitled to compensation." (*Nicholson* v. *Roundup Coal Co.,* supra.)

Section 98, page 302, Honnold's Workmen's Compensation, reads as follows: "It is a fundamental principle that the employer takes the employee subject to his physical condition when he enters his employment. Compensation laws are not made solely for the protection of employees in normal physical condition, but for those also who are subnormal, except in exaggerated cases. * * * It follows that neither a congenital weakness nor a pre-existing disease will render noncompensable an injury received under conditions which would otherwise make it compensable. But this does not, of course, dispense with the necessity that the injury shall have been actually caused by an accident or occurrence in the course of employment. Nor does a disease which under any rational work is likely to progress so as to finally disable the employee become a 'personal injury' merely because it reaches the point of disability while the work is being done. Since it is only when there is a direct causal connection between the exertion of the employment and the injury that an award of compensation can be made, the material question to be determined is whether the diseased condition was the cause, or whether the employment was the proximate contributing cause. In the former case no award can be made; in the latter it ought to be made. Thus where pre-existing heart disease of an employee is accelerated to the point of disablement by the exertion and strain of the employment, not due to the character of the disease acting alone or progressing as it would in any rational work, there may be found to have been a personal injury. Where it is impossible to determine how much of the

disability is due to accident and how much to the pre-existing condition, the whole disability is compensable.''

In this case the record speaks too positively as to the effect of the heat encountered in the emergency just preceding the death to entirely eliminate that feature and conclude that the man would have died in any event and under any circumstances. So we say that the testimony to the effect that deceased was constipated, had a headache, and had taken sal hepatica and some aspirin tablets, was not important enough to justify the conclusion that the heat exposure had no contributing effect.

The different conclusions announced by the board and by the district court are distinguished by the fact that the board apparently did not attach enough importance to the fact, recited by the court, that the heat was more intense near the chute and at the places where deceased was forced to work in order to clear the congestion in the chute. The findings of the board as to the general condition in the burner room were not controlling and were not specific enough to reach the same result as that reached by the court. We think that the record abundantly supports the finding of the court in that particular, and the resultant finding that the death was the result of the extraordinary heat. It is true that the board did not find directly that the man died of acute myocarditis. It merely found that there was no accident. It is true that there was no accident in the ordinary sense—that is, there was no act of violence; the man was not struck by any physical object—but nevertheless the facts of this case not only preponderate in favor of the fact that he died as a result of the heat, but stand uncontroverted and to our minds are conclusive.

There is much authority for the holding of the court that ██ heat prostration, such as occurred in this case, is an injury and an accident within the purview of the Compensation Act. The authorities on the subject are too many to enumerate here. In the case of *Walsh* v. *River Spinning Co.*, 41 R. I. 490, 103 Atl. 1025, 1027, 13 A. L. R. 956, the Rhode

Island supreme court discussed the death of a workman, a fireman, who was overcome by heat exhaustion. There the court quoted at great length from many opinions and works on the subject. Among other quotations there is one from Lord Robertson, in *Fenton J. Thorley & Co.,* [1903] App. Cas. 443, a heat case, where it was said: "Much poring over the word 'accident' by learned counsel has involved some subtle reasoning about these actions. I confess that the arguments seem to me to be entirely over the heads of Parliament, of employers and of workmen." The opinion further quotes the Earl of Halsbury, L. C., wherein he said: " 'We must be on our guard that we are not misled by medical phrases to alter the proper application of the phrase "accident causing injury," because the injury inflicted by accident sets up a condition of things which medical men describe as a disease. * * * It does not appear to me that by calling the consequences of an accidental injury a disease one alters the nature or the consequential results of the injury that has been inflicted.' In the same case Lord Macnaghten said: 'The accidental character of the injury is not, I think, removed or displaced by the fact that, like many other accidental injuries, it sets up a well-known disease, which was immediately the cause of death, and would no doubt be certified as such in the usual death certificate.' " (See, also, annotations to *Scott County School Board* v. *Carter,* 156 Va. 815, 159 S. E. 115, 83 A. L. R. 229.)

In addition to the specific evidence as to the death of the deceased, resort may be had to the facts and circumstances of the occurrence for a better understanding, and these have the probative value of evidence. (*Moffett* v. *Bozeman Canning Co.,* supra.) The facts and circumstances of this case bear out the claim that deceased died from heat exposure and not from heart disease. (See, also, *Williams* v. *Brownfield-Canty Co.,* 95 Mont. 364, 26 Pac. (2d) 980.)

Appellant asserts, however, and correctly, that the burden was not upon it to prove that Birdwell died from myocarditis or some other cause other than the industrial

accident; that the burden was on respondent to prove by a preponderance of the evidence that Birdwell did die as the result of accidental injury. Its counsel then argue that it was the duty of claimant to produce the best evidence possible as to the cause of death, and that the best evidence would have been the result of an autopsy, and, not having produced that evidence, claimant cannot recover. We cannot agree with this contention. This court, in a very recent case (*Williams* v. *Anaconda Copper Min. Co.*, 96 Mont. 204, 29 Pac. (2d) 649), discussed the matter of practice before the board, and pointed out that the board is an administrative body with only *quasi*-judicial powers; that it is the people's forum where interested parties may present their claims, if they so desire, without the benefit of or the expense incident to representation by counsel; that the primary function of the board is to ascertain the material facts, and to render a decision thereon, disregarding the niceties of ordinary procedure in courts. We think it would be entirely violative of the principles of the Workmen's Compensation Act to hold that, in the circumstances of this case, the widow had to demand and obtain an autopsy or be deprived of her right under the Act. It would seem to us that the obligation to take every necessary step to preserve evidence to establish the absolute cause of the death of the workman rested at least as heavily upon the employing company and its superintendent and medical adviser, as it did upon the widow of the deceased workman.

We have examined the record herein and considered all of the assignments of error, and we find that the judgment of the district court was without error and should be affirmed. It is so ordered.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, MATTHEWS and ANDERSON concur.

Rehearing denied January 18, 1935.