MARTHA HINES, CLAIMANT AND RESPONDENT, v. INDUSTRIAL ACCIDENT BOARD, DEFENDANT AND APPELLANT.
No. 10153.
Submitted September 26, 1960. Decided December 30, 1960.
358 P.2d 447.

L. V. Harris, Robert F. Swanberg, Helena, appeared for appellant and argued orally.

Myles J. Thomas, Helena, appeared for respondent, and argued orally.

MR. JUSTICE ANGSTMAN delivered the Opinion of the Court.

This is an appeal by the defendant, Industrial Accident Board, from a judgment awarding claimant compensation and reversing the Industrial Accident Board's order which denied compensation.

Claimant is the widow of the late Floyd J. Hines, who was employed by the City of Helena as foreman of the street department until his death on July 25, 1958. He was then 27 years of age. In July of 1958, the regular foreman of the sanitation department was in the hospital and deceased was substituting part of the time as foreman of the sanitation department in addition to his duties as foreman of the street department. While on the job on the afternoon of July 22, 1958, he complained of a headache to the superintendent of the street and sanitation department and that same evening began to perspire, had a temperature, was nauseated and had difficulty walking. On July 23, he was taken to the hospital and his illness was diagnosed as poliomyelitis, or spinal, bulbar polio, which diagnosis was confirmed by laboratory analysis.

The single question which arises on this appeal is whether or not the evidence preponderates against the findings of the Board so as to justify the trial court in finding that the presumption that the Industrial Accident Board decided correctly was overcome, and in finding that the poliomyelitis contracted by deceased constituted a compensable industrial accident. The trial court found that for three or more days prior to July 22, 1958, the work which Floyd J. Hines was doing for the city required him to be in the hot sun, climbing in and off trucks

which were patching streets with hot asphalt, and doing other fatiguing work in the hot sun which also required him to be at the city shops located near the hobo jungles and in close proximity to the garbage trucks of the city which often contained human fecal matter and other human waste matters, around which flies and blow flies abounded, that he also ate his lunch at the city shops, 50 to 100 feet from where the garbage trucks were parked and about a city block from the sewer which runs through the hobo jungles.

The court found that during the course of the day on July 22, Hines complained to his superior that he wasn't feeling well. He then took some aspirin tablets and stayed on the job, though his superior suggested that he go home. Upon completion of the days work he went home. He then had a fever, was vomiting, had convulsions and a running nose; he had no appetite, his head ached, he was sweating profusely, his skin was flushed and he complained of pain and weakness in his legs. The following day he could not walk; he was carried to a doctor's office and later to the hospital where he died.

The court found that the uncontradicted evidence disclosed the following:

"(a) polio virus is isolated from sewage and flies,

"(b) physical activity is a factor in predisposition to polio,

"(c) insects, water and sewage have all been regarded with suspicion in epidemics of polio,

"(d) headache, nausea, fever, vomiting, profuse sweating, flushed skin, diarrhea but more likely constipation, pain and weakness of the muscles of the extremities are found in polio cases."

The court specifically found that Hines' "work required him to be in places where it was more likely that the polio virus existed than it did in places where the public generally had occasion to be."

The court found that the Board's expert witness, Dr. Lar-

son, "did not exclude the possibility that deceased might have come in contact with the virus as a result of his work."

The court found that "No one knows exactly when, where, how or why a poliomyelitis victim contracts the disease."

As conclusions of law the court found that the Board was in error in finding that the "uncontroverted medical evidence showed that claimant's contraction of poliomyelitis was not causally related to his employment."

The court specifically found that the law does not require that the injury result from some fortuitous event.

The court found "An injury is accidental when either the cause or the result is unexpected. Murphy v. Anaconda Co., 133 Mont. 198, 321 P.2d 1094."

The court's conclusion of law number II is as follows:

"The Board's Conclusion of Law No. III that Martha Hines is not entitled to compensation is erroneous. The experts called by the Board in effect said that the work which Hines was doing could possibly have been a factor in his death. A possibility is all that is required. Gaffney v. I. A. B., 129 Mont. 394, 397, 287 P.2d 256."

The court's conclusion of law number III was as follows:

"Claimant is not required to prove her case with mathematical certainty. Weakley v. Cook, 126 Mont. 332, 249 P.2d 926."

Conclusion of law number IV was as follows:

"The Workmen's Compensation Act should be liberally construed, R.C.M. 1947, § 92-838, and under that act and the cases interpreting it the claimant's evidence must be viewed as showing that her husband's death was causally related to the work he was doing for the City of Helena."

A careful review of the evidence discloses that the trial court's findings of fact are supported by the evidence.

Pertinent excerpts from the testimony of Dr. Amos R. Little, Jr., are as follows:

"Q. Is polio infectious and contagious? A. *Yes.*

"Q. Could a person doing hard, manual labor in the hot

sun, spending long hours on his feet climbing on and off trucks and under great exertion, and exposed to human waste matter, contract the disease if he was exposed to the virus? A. The answer to that is *'yes'*.

"Q. In other words, might excessive fatigue and overwork be factors in the incidence of polio, that is, could they be? A. They could be. * * *

"Q. Does the virus exist in contaminated water and sewage water? A. Presumably. * * *

"Q. In other words, it could be that flies, especially blow flies, can carry this virus and infect food or anything that may come in contact with it if they have the virus? A. As far as I know, there is a possibility. * * *

"Q. It is possible, however, that the exposure that Mr. Hines was having if this virus was around in these garbage trucks and storm sewer, that he contracted the disease from that exposure? A. It's possible."

Dr. Eugene J. Sherba testified as follows:

"Q. Polio is an infectious and contagious disease? A. I would say it is.

"Q. And in the volume here which has been identified as the Encyclopedia of Medicine and Surgery, which I have obtained from the Montana State Law Library, and referring to volume X, on page 922, and 923 — incidentally I'm not trying to pose as an expert on polio, or am I trying to impeach anything you might say. My meager knowledge I have obtained from this volume and I read in here: 'Also contributing to susceptibility are fatigue, exposure to cold and other physical and physiological disturbances which in some cases seem to have opened the door for entry or activation of the virus.' A. If I am immune to polio, I can be fatigued and I won't get polio, but if I am not immune and possibly become extremely fatigued, there's a possibility.

"Q. You might be more susceptible? A. Is that your question, am I more susceptible?

"Q. You might be more susceptible? A. I can't answer that.

"Q. Nobody knows? A. I don't think we can answer that.

"Q. Could we say, however, that excessive fatigue and overwork might be factors in the incidence of polio? A. I think it's possible, but I don't think it's a very important factor. * * *

"Q. Also on page 922 the statement is made that 'The virus has been isolated from the sewage of a number of cities and from flies collected in widely separated areas.' That is probably correct, is it not? A. Yes.

"Q. Are headaches, nausea, fever, vomiting, profuse sweating, flushed skin, diarrhea or perhaps constipation, pain and weakness of the muscles of the extremities, all symptoms of the disease? A. Yes, they can be.

"Q. Is this a fact that the greater the exposure of a person to the polio virus, the greater the possibility of that person contracting the disease? A. I would say in general this is probably true if a person is not immune."

Dr. Carl L. Larson of the Rocky Mountain Laboratory at Hamilton, Montana, testified in behalf of the Board, as follows:

"Q. You were brought here from Hamilton by the Industrial Accident Board? A. Yes.

"Q. In this matter in Hamilton about which you testified where you found virus in one of the sewers? A. We find the virus in all of the sewers, the six outlets that we have in the city are located so we test all the sewers in town, you see, before they empty into the sewage disposal plant * * *

"Q. What would you say about this statement that appears on page 922: 'The virus has been isolated from the sewage of a number of cities and from flies collected in widely separated areas.' What would you say about that? A. That's a good statement. *I'll agree with it.*

"Q. Doesn't that probably fit in with what you say that maybe this disease can be transmitted, this virus can be trans-

mitted, by flies? A. There's a long way between 'maybe' and 'Yes, it can be.'

"Q. It's possible that it can? A. It's possible, there are a lot of things that are possible."

Dr. Larson also testified in respect to the connection with the employment as follows:

"There is some evidence that hard work during the time one has a virusemia will tend to localize the virus in the central nervous system and cause paralysis."

Defendant produced from the Montana State Board of Health, Dr. A. Howard Fieldsteel, a virologist, at the present time a director of the virus laboratory in Montana; he testified that virology is a general study of viruses, virus diseases, methods of propagation of virus, methods of the spread of virus and methods of protecting against virus disease. His testimony was as follows:

"Q. How much of your work and experience has been with poliomyelitis virus? A. Well, during the period of my post fellowship, all of my work was concerned with poliomyelitis. * * *

"Q. Is the cause of polio known? A. Yes, polio is caused by a virus, or caused by one of three polio viruses. * * *

"Q. What did you find, if anything? A. We found that the brain and spinal cord contained type-one polio virus.

"Q. And referring to a statement which appears on page 922 of that volume, I will ask you if you agree with this statement: 'Also contributing to susceptibility are fatigue, exposure to cold, and other physical and physiological disturbances which in some cases seem to have opened the door for entry or activation of the virus.' A. I would take exception to that statement. I think it's extremely misleading for this reason: from what we know from the studies carried out, it has been shown that fatigue, exposure to cold and other things *contribute,* but not susceptibility; they *contribute* only after an individual has taken the virus into his body and is beyond the incubation

stage where the individual is showing signs of polio, they *contribute to bringing about a more severe disease,* but not prior to the individual's taking the virus. It does not increase the susceptibility, no. * * *

"Q. If there were large quantities of fecal matter from childrens' diapers and adults' clothing in garbage trucks some 50 to 100 feet away which attracted large numbers of flies and those flies flew a distance of 100 feet and landed on food that a person was eating, is it possible that the virus could have been carried? * * * A. You must assume first of all, that there was virus present in the fecal material. If there was virus present in the fecal material, it would be possible for the flies to pick it up and carry it to some other materials.

"Q. And then a person eating that food might contract the disease? A. Yes, a person might contract the disease, but again, you have to assume there are large quantities of virus present. You can't assume that there are only minute quantities. These things occur only when there is a large quantity of virus as in epidemic periods.

"Q. Talking about large quantities of virus and epidemic periods, doctor, I will ask you if this is a fact, that the greater the exposure of a person to polio virus, the greater the possibility of that person contracting the disease? A. I would think so, yes."

Many decisions of this court are in line with the decision of the trial court. Neurosis was held compensable in Sykes v. Republic Coal Co., 94 Mont. 239, 22 P.2d 157; Best v. London Guarantee & Acc. Co., 100 Mont. 332, 47 P.2d 656; sunstroke was involved in Birdwell v. Three Forks Portland Cement Co., 98 Mont. 483, 40 P.2d 43; heart disease was found compensable in Levo v. General-Shea-Morrison, 128 Mont. 570, 280 P.2d 1086; Parkinson's disease was found to have resulted from accident in Moffett v. Bozeman Canning Co., 95 Mont. 347, 26 P.2d 973, and Gaffney v. I. A. B., 129 Mont. 394, 287 P.2d 256; meningitis was held covered by the act in Williams v. Brown-

field-Canty Carpet Co., 95 Mont. 364, 26 P.2d 980; diseased kidneys were involved in Tweedie v. I. A. B., 101 Mont, 256, 53 P.2d 1145.

The last case in which this subject received consideration by this court is the case of Young v. Liberty National Insurance Co., 138 Mont. 458, 357 P.2d 886, decided December 16, 1960, wherein this court said:

"* * * There can be an industrial accident within the meaning of the Workmen's Compensation Act even though there is no accident in the ordinary sense, i. e., an act of violence whereby an employee is struck by an object or injured by a fall. Exposure to heat or cold resulting in injury to an employee is an industrial accident which is compensable under our laws. Ryan v. Industrial Accident Board, 100 Mont. 143, 45 P.2d 775; Birdwell v. Three Forks Portland Cement Co., 98 Mont. 483, 40 P.2d 43; Nicholson v. Roundup Coal Min. Co., supra, 79 Mont. 358, 257 P. 270. Also, physical exertion by an employee which contributes to, or causes injury to the employee has been held to be an industrial accident. Rathbun v. Taber Tank Lines, Inc., 129 Mont. 121, 283 P.2d 966; Murphy v. Anaconda Co., 133 Mont. 198, 321 P.2d 1094.

"Respondent's disability being a direct result of his exposure to extremely cold weather and physical exertion to a point of exhaustion, it is manifest that he was injured as the result of an industrial accident.

"There being no question that the incident of February 13, 1953, was within the course of respondent's employment, the only remaining point of appellants' third contention which needs discussion is whether respondent's disability arose out of his employment.

"An industrial accident arises out of a worker's employment whenever it results from the worker being exposed by his employment to a greater degree of risk than that to which people of the community generally are subjected. Wiggins v. Indus-

trial Accident Board, 54 Mont. 335, 170 P. 9, L.R.A.1918F, 932.

"The particular circumstances under which respondent's employment was being pursued on February 13, 1953, did subject him to a greater risk of being injured by the cold weather than were people of the community in general; therefore, it can be fairly said that his disability arose out of his employment."

In Richardson v. J. Neils Lumber Co., 136 Mont. 601, 341 P.2d 900, 904, this court, quoting from Wiggins v. Ind. Acc. Board, 54 Mont. 335, 170 P. 9, said:

" '* * * If, by reason of the nature of the employment itself or the particular conditions under which the employment is pursued, the workman is exposed to a hazard peculiar to the employment under the circumstances, and injury results by reason of such exposure, then it may be said fairly that the injury arises out of the employment, or * * * [that] the workman must have been exposed by his employment to more than the normal risk to which the people of the community generally are subject.' "

In Industrial Commission v. Corwin Hospital, 126 Colo. 358, 250 P.2d 135, it was held that a nurse who had been working exclusively in hospital polio wards in close contact with polio patients under conditions which caused her to be overtired, contracted polio herself after two months on the job, the disease and resulting disability was "accidentally sustained" within the Workmen's Compensation Act, and was compensable. Judgment of the trial court was reversed and the cause remanded with directions to reinstate the award of the commission. See also Vol. 23 NACCA Law Journal, p. 163.

A review of the record and the authorities in respect to the question of whether or not the death of claimant's husband was caused or contributed to by his employment, we find that the trial court properly answered in the affirmative and properly

598

awarded compensation to claimant. The judgment appealed from is affirmed.

MR. JUSTICES BOTTOMLY and ADAIR concur.

MR. JUSTICE CASTLES:

I dissent. Not having had the opportunity to express my views when the majority opinion was filed, I wish to do so now.

The 1961 Legislative Session is now meeting, but in this opinion the majority of this court has taken over legislative duties by amending the statutes. The statute, R.C.M. 1947, § 92-418, specifically excludes "contraction of disease" from workmen's compensation by specific definition. How the majority of this court can ignore such a plain, unequivocal legislative definition is beyond this writer's comprehension. If this can be done, one wonders why a legislative session is necessary.

The language of two sections of the Montana Workmen's Compensation Act is involved in this case. R.C.M. 1947, § 92-614, provides, in part:

"Every employer * * * shall be liable * * * to an employee * * * who shall receive an *injury* arising out of and in the course of his employment * * *." Emphasis supplied.

"Injury", as used in the Workmen's Compensation Act, is defined as follows in section 92-418:

" 'Injury' or 'injured' refers only to an injury resulting from some fortuitous event, *as distinguished from the contraction of disease.*" Emphasis supplied.

It is recognized that the Workmen's Compensation Act is to be liberally construed in favor of the workman. R.C.M. 1947, § 92-838; Murphy v. Anaconda Co., 133 Mont. 198, 321 P.2d 1094. However, this court may not disregard plain provisions of the statute under the guise of liberal interpretation. State ex. rel. Magelo v. Industrial Accident Board, 102 Mont. 455, 59 P.2d 785; Geary v. Anaconda Copper Min. Co., 120

Mont. 485, 188 P.2d 185. From the express language of section 92-418 it is clear that the contraction of a disease such as poliomyelitis is not an "injury" within the contemplation of the Montana Workmen's Compensation Act. For this reason compensation should be denied in the instant case.

Claimant has pressed several arguments upon the court in attempting to justify an award. She has cited Montana decisions which she claims have allowed compensation where there is a disease involved. She has also cited decisions from other jurisdictions allowing compensation where the specific disease of poliomyelitis is involved.

This court has held that there may be compensation for the results of a disease where the disease has been aggravated or accelerated by an injury arising out of and in the course of the employment. Nicholson v. Roundup Coal Min. Co., 79 Mont. 358, 257 P. 270; Murphy v. Industrial Accident Board, 93 Mont. 1, 16 P.2d 705; Gaffney v. Industrial Accident Board, 129 Mont. 394, 287 P.2d 256; Young v. Liberty National Insurance Co., 138 Mont. 458, 357 P.2d 886. However, this is much different than allowing recovery for the mere contraction of disease where no "injury" is involved within the statutory language.

Claimant has cited certain decisions of this court where recovery was granted for conditions of heart disease. However, these cases recognized that there was an "injury" within the statutory language which was caused or contributed to by the employment. Rathbun v. Taber Tank Lines, Inc., 129 Mont. 121, 283 P.2d 966, held that an unexpected internal heart failure from stress and strain constituted a "fortuitous event" and therefore an "injury" within the statutory language. Murphy v. Anaconda Company, 133 Mont. 198, 321 P.2d 1094, held that heart failure which resulted from the usual stress and strain of the employee's work constituted an "injury" within the statute. However, these cases are not comparable to the fact situation in the instant case.

Claimant, and the majority opinion, has cited decisions of other jurisdictions where recovery was allowed in cases involving the disease of poliomyelitis. Some of these decisions allowed compensation where an injury arising out of and in the course of the employment caused the contraction of poliomyelitis. In none of these cases was there involved a statute similar to the Montana statute. Claimant has stressed the California decision of Los Angeles County v. Industrial Accident Comm., 13 Cal.App.2d 69, 56 P.2d 577, which allowed compensation to a nurse who was working in a hospital where there were active cases of poliomyelitis present. In that case, there was also much evidence of the existence of the disease among the doctors and nurses working in the hospital. However, the California statutes on the subject are much different than those of Montana. In California, (West's Ann. Cal. Labor Code, § 3201 et seq.) compensation is allowed for an "injury" arising out of and in the course of the employment, but at the time the Los Angeles County case was decided "injury" was defined as follows by the California statutes: "The term 'injury,' as used in this act, shall include any injury *or disease* arising out of the employment * * *." Emphasis supplied. Cal.Stats.1919 ch. 471, § 3(4), p. 911. So it is evident that the California statutes defining "injury" expressly include contraction of disease within the definition, whereas, the contraction of disease is expressly excluded from the definition of "injury" in the Montana statute. For this reason, any California cases on the subject have no application in Montana. The same is true of Colorado where the majority opinion relies on Industrial Commission v. Corwin Hospital, 126 Colo. 358, 250 P.2d 135.

We can perceive of no case which would more clearly fall within the exclusion of the language "as distinguished from the contraction of disease" than the instant case. In holding this claim to be compensable, the statutory language is being abrogated and the result is nothing but gross judicial legisla-

tion. From the language of section 92-418 it is clear that the legislature did not intend to include the contraction of disease within the ambit of the Workmen's Compensation Act. This legislative intent is further evidenced by the recent passage, in 1959, of the Occupational Disease Act by the legislature which is now codified as R.C.M. 1947, §§ 92-1301 to 92-1368. This act authorizes compensation for the contraction of certain specified occupational diseases where there is a direct causal connection between the employment and the contraction of the disease. It should be noted that poliomyelitis is not one of the specified occupational diseases for which compensation is allowed. When this Occupational Disease Act was passed the Legislature intended to allow compensation for certain diseases which were caused by the employment and must have realized that diseases were not, at that time, within the scope of the Workmen's Compensation Act. The Legislature obviously did not intend to include the infectious, contagious, contact type disease of poliomyelitis within the coverage of the Montana Workmen's Compensation Act by the plain language of section 92-418.

In addition to the above reason for denying compensation, the claimant has also failed to sustain her burden of proof in proving, by a preponderance of the evidence, a causal connection between the employment and the contraction of the disease. See Landeen v. Toole County Refining Co., 85 Mont. 41, 277 P. 615; Kerns v. Anaconda Copper Min. Co., 87 Mont. 546, 289 P. 563.

Claimant is attempting to show a causal connection between the employment and the contraction of the disease because of the nature of the deceased's work. The nature of the employment, from the evidence, necessitated his being outside in the hot sun. It was claimed that the deceased ate his lunches at the city shops which were near hobo jungles and a storm-sewer outlet. It was also claimed that flies abounded in the area. There was some evidence that the garbage trucks sometimes

contained human fecal matter, and that they were parked in the shop area during the lunch hour.

Concerning the causal connection, the testimony of four doctors was offered into evidence. The two doctors called by the claimant as witnesses were both attending physicians at the time of deceased's death. The two doctors called as witnesses for the Board had not been attending physicians but were qualified as having special knowledge concerning the disease of poliomyelitis. All of the doctors testified that poliomyelitis is a contact, epidemic-type of disease and that the primary method of contracting it is through person-to-person contact. All of these witnesses agreed that the virus could exist in human excreta. They testified that fatigue was not a factor which would make a person more susceptible to the contraction of the disease. The testimony concerning flies was to the effect that they have not been considered much of a factor during epidemics and they have also not been considered a major source from which the disease could be contracted. It is significant that when claimant's witnesses were tendered a hypothetical question which included the conditions and surroundings of the deceased's employment, and were asked if this contributed to the death of deceased they would not so testify. One of these doctors testified that he could not say where, how, or when the deceased contracted the disease and that it was possible the deceased contracted it at home or going to or from his job as well as on the job. The other doctor called by the claimant testified, concerning this same hypothetical question, that the factors could possibly be related to the contraction of the disease by the deceased but probably they were not. The testimony of the doctors who testified for the Board was, in essence, that the deceased would have been more likely to have contracted the disease in his contact with other people, either at home or at a funeral which he had attended, than to have contracted the disease because of the conditions of his employment.

The claimant has not sustained her burden of proving the causal connection between the employment and the contraction of the disease by the above-evidence.

For the foregoing reasons, the judgment of the district court should be reversed and the order of the Industrial Accident Board, denying compensation, should be reinstated.

MR. CHIEF JUSTICE HARRISON:

I concur in the dissenting opinion of Mr. Justice Castles.